HOME TELEPHONE COMPANY, Appellant, v. SARCOXIE LIGHT & TELEPHONE COM-PANY.

In Banc, July 3, 1911.

1. **JUDICIAL NOTICE: Facts of History: Telephone Consolidation.** Courts take judicial notice of facts of current history, and what the general public knows the court is presumed to know. The court, therefore, will take judicial notice of the fact that a few years ago the Bell Telephone Company had no competitor in this State; that local telephone systems were later organized in the towns and country districts; that there being no competition in long-distance service, it was a matter of indifference to the Bell Company whether the local companies were permitted physical connection of their lines with its, and that in most places such connection was not permitted; that later the Kinloch Company succeeded in establishing physical connection with most of the local companies, and put in long-distance service throughout the State in competition with the Bell Company, which is only a name for the Missouri & Kansas Telephone Company and many other subsidiary companies; that the contract in suit between two companies in Jasper county was one of a number made during this period of developing competition to the Bell Company; and that in time both the Bell Company and the Kinloch became active in a desire for physical connection with local companies and rural lines to serve the whole public; and the suit in question between said local companies, to enforce a contract providing for connections of lines and transmission of messages to distant points, being in fact a contest between the Kinloch Telephone

Company and the Bell Telephone, will be determined, in the construction of the contract and statutes, with that history in view.

2. ———: ———: **Telephone Competition.** An agreement between a local telephone company at Joplin and another at Sarcoxie, for connecting lines to Carthage and other places in the county, and for the transmission of messages from the lines of one to those of the other, with the ultimate purpose of connection at Joplin with the lines of the Kinloch Company for the transmission of long-distance messages, was not intended, as is shown by the history of the times and the contract itself, to stifle competition.

3. **Telephone Competition: Different Fields.** The joining of two telephone lines operating in different fields does not create a monopoly or stifle competition. That only broadens the use of the lines. If the purpose of the agreement between a Joplin telephone company and a Sarcoxie company was to make one continuous system of the lines owned and controlled by and connected with the two contracting companies, by making physical connection of the several lines through switch-boards, it was not an illegal contract.

4. ———: **Physical Connections: Statute.** Sec. 1254, R. S. 1899, is broad enough to authorize two telephone companies to enter into contract providing that lines of one, through switch-boards, shall be so physically connected as to form a continuous system and that the messages received by one shall be routed over the lines of the other.

5. ———: ———: ———: **Switch Boards: Compelled Connection.** Sec. 1255, R. S. 1899, does not compel one telephone company to physically connect its lines with those of another. It requires such company to provide sufficient facilities at its office "for the dispatch of the business of the public, to receive dispatches from and for any individual, and on tender of payment of the usual charges to transmit the same promptly and with impartiality and in good faith;" and that places such other company and the individual on the same basis; that is, either can have a message transmitted over the company's lines, but neither has a right to have his or its own line or lines physically connected, by switch boards or otherwise, with those of the other. One company has no right to take physical control of the lines of another for forwarding its messages. That statute does not authorize one company which has entered into a contract with another in another town for the physical connection of their lines so as to form a continuous system to breach its contract on the ground that there is another company demanding that it forward its messages over its lines.

6. ———: ———: **By Contract.** A competitive telephone company cannot compel physical connection of its lines with the lines of another company. But two companies operating in different fields may by contract arrange for physical connection of their lines, and such contract is valid, and will be enforced, although the contract provides that neither party thereto shall enter into a like contract with any other company, and although, if such contract be enforced, it will deprive one of them of the right to make such physical connection with a third company engaged in long-distance service.

7. ———: ———: ———: **Pools and Trusts: Raised by Violator.** Nor is such contract, if made between two telephone companies operating as to their local business in different fields, and made in contemplation of a continuous competitive line as to long-distance business, in violation of the statutes relating to pools and trusts. Besides, such a defense from the company which has enjoyed the benefits of the contract, comes with poor grace.

Appeal from Jasper Circuit Court.—*Hon. David E. Blair*, Judge.

REVERSED AND REMANDED.

*Hugh Dabbs* and *McReynolds & Halliburton* for appellant.

(1) A court will grant injunction to protect contract right, and it is not necessary that the injury should be irreparable and defendant insolvent. Brewing Co. v. Water Works, 34 Mo. App. 119; Gordon v. Mayfield, 84 Mo. App. 367; Tool Co. v. Springs Co., 93 Mo. App. 530; Musser v. Brink, 80 Mo. 350; Jones v. Williams, 139 Mo. 1; Electric Works v. Magnet Co., 9 Am. & Eng. Ann. Cases, 975. (2) A court of equity has the right to specifically enforce the contract between plaintiff and defendant. Railroad v. Railroad, 144 N. Y. 152; Tel. Co. v. Harrison, 145 U. S. 549; Tel. Co. v. Railroad, 129 Fed. 849; Fashion Co. v. Siegel-Cooper, 157 N. Y. 60; Joy et al., 138 U. S. 1. (3) The contract between the plaintiff and defendant is made by authority of and is especially authorized by Sec. 3329, R. S. 1909. Under this section

it is held that railroad companies may make an exclusive operating contract with another company or carrier, and such contracts are held not to be in restraint of trade and not a monopoly. Ferry Co. v. Railway, 73 Mo. 389; Ferry Co. v. Railway, 128 Mo. 224; Railway v. Railway, 135 Mo. 173; Railroad v. Car Co., 139 U. S. 79; Richmond v. Railroad, 26 Iowa 191; Railroad v. Richmond, 19 Wall. 584; Bridge Cases, 10 U. S. App. 98; Board v. Christie, 198 U. S. 237. Sec. 2329, R. S. 1909 (Sec. 1254, R. S. 1899) having authorized telephone companies to make contracts like the one in issue and being a special statute relating to telephone and telegraph companies alone, and the anti-trust sections being general, if in conflict, the special act must be taken to be intended to constitute an exception to the general act, and is not repealed by the general law, even though the latter should be passed subsequent in point of time to the former. Manker v. Faulhaber, 94 Mo. 441; Rushburg v. Railroad, 161 Mo. 85; State ex rel. v. Hostetter, 137 Mo. 644; Donnell v. Lee, 101 Mo. App. 191; State v. Kessell, 121 Mo. App. 233; State v. Bunswanger, 122 Mo. App. 78; State ex rel. v. Foster, 187 Mo. 590; State ex rel. v. Wilder, 197 Mo. 27; Endlich on Inter. of Stat., sec. 181; Sutherland on Stat. Cons., secs. 157-8; Lough v. Outerbridge, 38 N. E. 292. (4) The contract set out in the petition is not invalid as being in restraint of trade, monopolistic, or violation of Secs. 10298, 10299 and 10301, R. S. 1909, the restraint, if any, being only partial, and the restriction reasonable, and not so large as to interfere with the rights of the general public. Skrainka v. Scharringhausen, 8 Mo. App. 522; Long v. Toll, 42 Mo. 545; Ferry Co. v. Railroad, 73 Mo. 389, 116 U. S. 615; Finck v. Granite Co., 187 Mo. 269; State v. Oil Co., 218 Mo. 379; Eddy on Combinations, sec. 224; Cook's Combinations and Monopolies, sec. 145; State v. Cadwallder, 87 N. E. 650; Tel. Co. v. Tel. Co., 112 N. Y. Supp. 425; Joy v. Railroad,

138 U. S. 1; Fashion Co. v. Railroad, 68 Am. St. 749; Tel. Co. v. Railroad, 68 L. R. A. 970; Railroad v. Railroad, 144 N. Y. 152; Tel. Co. v. Harrison, 145 U. S. 549; Railroad v. Railroad, 5 DeG. & M. 138; Railroad v. Railroad, 163 U. S. 560; Railroad v. Railroad, 5 McLean (U. S.) 450; Railroad v. Railroad, L. R. 16 Eq. 433; Railroad v. Railroad, 24 Fed. 516; Tel. Co. v. Railroad, 129 Fed. 849; U. S. v. Pipe Co., 175 U. S. 211; Cates v. Atlanta Co., 46 L. R. A. 431; Donovan v. Pacific Co., 119 U. S. 276; Railroad v. Car Co., 135 U. S. 79; Railroad v. State, 99 Tex. 34; State ex rel. v. Tel. Co., 36 Ohio St. 296; People ex rel. v. River Co., 19 Abbott's New Cases, 479; Woods v. Whitehead, 165 N. Y. 545; Grasselli v. Loudon, 11 Ohio St. 357; Brass v. McConnell, 114 Iowa 401; Railroad v. Railroad, 110 U. S. 680; Railroad v. Express Co., 117 U. S. 34; Railroad v. Car Co., 139 U. S. 79; State v. Brown, 10 Dec. Ohio, 38; Snyder v. Depot Co., 30 O. C. C. 368; Ferry Co. v. Railroad, 73 Mo. 389; U. S. v. Tel. Co., 50 Fed. 28; Steamboat Co. v. Railroad, 45 N. Y. Supp. 109; Richmond v. Railroad, 26 Iowa, 191; Greenhood on Public Policy, p. 208; Cook on Monopolies, sec. 142.

*Thomas & Hackney* for respondent.

(1) The said contract in so far as it attempts to prevent either party from permitting any other person or corporation to make connections with their lines and in so far as it attempts to prevent either of said corporations from transmitting messages and allowing the use of their lines to persons or corporations other than the appellant and respondent is void as being contrary to Sec. 3030, R. S. 1909. Contracts entered into in violation of a statute are void notwithstanding such contract is not expressed to be void by the terms of the statute. 9 Cyc. 366; 15 Am. & Eng. Ency. Law (2 Ed.), 941; Haggerty v. Railroad, 143

Mo. 238; Assn. v. L. & C. Co., 138 Mo. 394; Sumner v. Summers, 54 Mo. 340; Miller v. Ammon, 145 U. S. 421; Pernn v. Bornman, 102 Ill. 523; Sawyer v. Sanderson, 113 Mo. App. 233; Sharp v. Teese, 9 N. J. L. 352; Bank v. Owens, 27 U. S. 527; Harris v. Runnels, 12 How. 79. (2) The respondent having furnished telephone facilities to the appellant cannot refuse to furnish like facilities to all other telephone companies, notwithstanding it is forbidden to do so by its contract with the appellant. Such a contract is void at common law governing monopolies in restrain of trade, as well as void under the statute. Telephone companies are common carriers though not liable as insurers. Through voluntarily undertaking to serve the public in their chosen capacity, they assume at least one obligation incident to the relation of a common carrier. This obligation the common law annexed to the use of their instruments which operates to fix the duty upon such companies to furnish impartial service to any one offering to comply with their reasonable requirements not only in respect to their public station system, but also to the private use of instruments installed in office, residence and place of business. The obligation arising from the use is to furnish each and all equal facilities for connection without unjust discrimination. State ex rel. v. Tel. Co., 93 Mo. App. 349; Tel. Co. v. Tel. Co., 17 Atl. 1071; State ex rel. v. Cadwallader, 87 N. E. 644; State ex rel. v. Tel. Co., 17 Neb. 126; State ex rel. v. Tel. Co., 61 S. C. 83; State ex rel. v. Tel. Co., 23 Fed. 539; State ex rel. v. Tel. Co., 47 Fed. 633; Tel. Co. v. State ex rel., 50 Fed. 677; State ex rel. v. Tel. Co., 36 Ohio, 296; Tel. Co. v. Tel. Co., 66 Md. 399; Hockett v. State, 105 Ind. 250; Tel. Co. v. Bradbury, 106 Ind. 1; Tel. Co. v. State ex rel., 118 Ind. 194; Tel. Co. v. Tel. Co., 3 Atl. 829; Tel. Co. v. Tel. Co., 171 Fed. 130; 27 Am. & Eng. Ency. Law (2 Ed.), 1021; Jones on Telephones, sec. 243; Tel. Co. v. Tel. Co., 147 Mo. App. 216. (3) The exclu-

-sive privilege in the contract now sought to be en-forced is violative of the public policy of the State. Sec. 10298, R. S. 1909; Sec. 10299, R. S. 1909; State ex rel. v. Oil Co., 218 Mo. 1. (4) Counsel for appellant in their brief seem to rely exclusively on Sec. 3329, R. S. 1909, to uphold the validity of the contract in issue. Said section certainly cannot be so con-strued by this court as to permit appellant to enter into a contract with respondent which would violate Secs. 3328 and 3330. While the respondent and appellant had the right under Sec. 3329 to enter into a con-tract by which their respective lines would be con-nected, yet the respondent had no right to disable it-self by such contract from performing its duty to the public, enjoined upon it by Sec. 3330. Jaicks v. Merrill, 201 Mo. 91; St. Louis v. Klausmeier, 213 Mo. 119; Ewing v. County, 216 Mo. 681; State ex rel. v. Ferry Co., 208 Mo. 622. In conclusion, respondent main-tains that the identical question involved in this case is settled adversely to appellant by the St. Louis Court of Appeals in the case of Tel. Co. v. Tel. Co., 147 Mo. App. 216.

GRAVES, J.—Plaintiff sues defendant to enjoin it from violating a certain agreement made between them May 4, 1905, concerning the exchange of business on their respective lines. The material portions of the agreement read:

"This agreement, entered into by and between the Home Telephone Company, a corporation of Joplin, Missouri, first party, and Sarcoxie Light and Telephone Company, a corporation of Sarcoxie, Mis-souri, second party.

"Witnesseth that whereas, the first party is operating telephone exchanges at Carthage, Car-terville, Webb City and Joplin, Missouri, and the second party operating an exchange at Sarcoxie, Mis-souri, and both operating local lines that toll business

is handled over, connecting principal points in Jasper county, and arrange for the interchange of business with independent or opposition exchanges or toll lines in said county, and if desirable and practicable, extend such service beyond said county, under such arrangements as will be advantageous.

"Now therefore, the parties hereto, for themselves their successors and assigns, in consideration of the mutual promises herein made, covenant and agree as follows, to-wit:

"First. The first party agrees to build and maintain a metallic No. 10 iron, or a copper No. 10, telephone line or lines from Carthage to Sarcoxie, then to connect with the party of the second part's line to be run from the city limits to its exchange for the purposes herein specified.

"Second. Each party hereto grants a license to the other party to connect with the telephone exchange or system of the other party through its switch board at Carthage and Sarcoxie so that an interchange of business may at all times be carried on between said parties. Such connection to be completed on or before June 1, 1905, it being understood and agreed that the line of both parties hereto shall be so operated that service may be given from all lines owned, controlled or connected with the lines of either of the parties hereto, over the lines of the other and its connection. And each party hereto agrees not to enter into any contract with any other person, firm or corporation whereby any of the rights, privileges or advantages herein acquired by either party may be impaired. . . .

"Fourth. Each party agrees to transmit all messages destined to points on the lines of the other party hereto not reached by its own system or wires, to and over the lines owned or controlled by the other party.

"In consideration of the benefits to be derived by each of the parties hereto from the toll service

herein provided to be furnished by each party, agrees to transmit all business to points reached by its own line or lines, and those to be constructed or acquired within Jasper county over the lines of the parties hereto.

"Fifth. Each party hereto agrees to receive from the other and transmit all messages destined to points within its territory or on connecting lines which may be delivered to it by the other parties hereto, subject to all the conditions herein named. . . .

"Twelfth. This contract shall be and remain in force and effect during the period of twenty-five years from the date hereof, and thereafter until one year's written notice shall have been given by either party to the other of its intention to terminate the same. Provided that if the franchise of either party hereto shall expire within less time than above mentioned, and be not renewed, and such party be compelled to cease doing business, this contract shall not be construed as requiring such party to do that which it is then unable to do, and provided further that each party shall at all times during the existence of this contract furnish to the other party connection with an independent telephone exchange in Carthage and Sarcoxie, Missouri, at current rates, otherwise this contract may be terminated at will by the party at an earlier period, but such action by either party shall not relieve the other from the obligations herein assumed."

The petition then charges that the plaintiff then built the line from Carthage to Sarcoxie and gave the connections and did all other things required of it by the contract. At some length the petition charges the delinquencies of the defendant, but one paragraph will fairly present the matter. Such paragraph of the petition reads:

"Plaintiff states that the defendant in violation of the terms, condition and provisions of said

contract and in violation of the rights of plaintiff thereunder, has since the 10th day of April, 1906, up to the present time, failed, neglected and refused to transmit to plaintiff all of the telephonic messages destined to points on the lines of plaintiff, or lines controlled by and connected with plaintiff's lines, and not reached by defendant's lines, as provided in said contract; but on the contrary has entered into a contract with the Missouri and Kansas Telephone Company, commonly known as the Bell Telephone Company, a competitor of plaintiff with lines running in competition with plaintiff's lines in Jasper county, Missouri, and a large number of other points, in violation of the rights, privileges and advantages of said contract to the plaintiff and impairing the rights of plaintiff thereunder, by and through which defendant has since the 10th day of April, 1906, delivered and transmitted to said company a large part and proportion of the messages received by defendant and destined for points on the lines of plaintiff and lines controlled and connected with plaintiff and not reached by defendant's system of wires, to plaintiff's damage in the sum of $10,000."

The concluding portion of the petition thus reads:

"Plaintiff states that the defendant is at the present time violating and continues to violate said contract as aforesaid by continuing its unlawful connection for the purposes hereinbefore stated, with the Missouri and Kansas Telephone Company, as aforesaid, and unlawfully transmitting over the lines of said company the business and messages which rightfully should be transmitted over the lines of this plaintiff under said contract.

"Plaintiff states that unless defendant is enjoined it will continue said violation of said contract and deprive it of its benefits, profits, tolls and revenues that it should rightfully derive therefrom in the future.

"Plaintiff states that it has no adequate and complete remedy at law to prevent the future violation of the contract on the part of the defendant, and that an action of damages is not sufficient and adequate to protect the rights of plaintiff, because the continued breaches of said contract on the part of defendant in the future, as aforesaid, will result in a multiplicity of suits.

"Wherefore, plaintiff prays the court for a judgment against defendant for damages already accrued in the sum of $10,000, as aforesaid, and in order that defendant may hereafter be restrained from further damaging plaintiff and violating the terms of said contract and impairing or destroying the business of plaintiff as to avoid a multiplicity of suits, plaintiff prays the court that defendant may be restrained from transmitting any telephonic messages received by it at any of its exchanges and destined for points not reached by defendant's system of wires, and to points on the lines of plaintiff, or lines controlled by plaintiff or on connecting lines with plaintiff, to the Missouri and Kansas Telephone Company or to any other telephone company competing with plaintiff at such point during the term and life of said contract, and that the court issue its mandatory order and injunction requiring the defendant to deliver and transmit all such messages to this plaintiff during the term of said contract, and in all respects to comply with the agreements and provisions therein contained, and that defendant be restrained from further physical connection with the Missouri and Kansas Telephone Company for the transmission of messages in violation of the terms of said contract, and for such other judgments and decrees as to the court may seem meet and just."

Other paragraphs of the petition may require notice in the discussion of the questions presented.

To this petition the defendant filed its demurrer in the following language:

"Now comes the defendant and demurs to the plaintiff's petition herein and says that the same is insufficient in law for the reasons following, to-wit:

"1st. Because said petition does not state facts sufficient to constitute a cause of action.

"2d. Because the contract between the plaintiff and defendant set forth in said petition is void as against public policy, in so far as said contract undertook to prevent the defendant from doing the acts complained of in the petition.

"3d. Because said contract is in violation of the statute of the State of Missouri respecting the duties of telephone companies, and particularly of sections 1254, 1255 and 1256, Revised Statutes 1899.

"4th. Because the acts complained of in plaintiff's petition would not entitle the plaintiff to recover damages against this defendant nor would they entitle the plaintiff to the equitable relief sought in this action."

This demurrer the court sustained, and the plaintiff refusing to plead further its bill was dismissed.

Plaintiff then filed a motion to set aside the order sustaining such demurrer and dismissing its said bill, which motion duly preserved in a bill of exceptions, reads:

"Now comes the defendant and moves the court to set aside the order sustaining the demurrer to plaintiff's bill and the judgment dismissing plaintiff's bill and grant plaintiff a new hearing for the following reasons, to-wit:

"1. Because said order and judgment is violative of article 5 of the amendments to the Constitution of the United States. And is violative of section 10, article 2, and section 30 of article 2, of the Constitution of the State of Missouri. In that it deprives

plaintiff of its property without due process of law. And in that under said rulings no remedy is afforded plaintiff for the injury to its property.

"2. Because said ruling of the court is violative of section 15 of article 2 of the Constitution of Missouri. In that it impairs the obligation of the contract between plaintiff and defendant."

This motion the court, *nisi,* overruled and defendant brings the cause here by appeal.

I. There is but little use in mincing words about the real issues in this case. It is apparent upon the face of things, in view of State history, of which we must take notice, that the real contest is between the Kinloch Telephone Company upon the one side and what is usually known as the Bell Company upon the other. The two local companies are but instrumentalities, one in the hands of the Kinloch Company, and the other once in its hands, but now in the hands of the Bell Company. The court does not know less of the developments in the State than does the average citizen. The average citizen knows that there was a time when the Bell Company had no competitor in this State. The average citizen knows that local phone systems were organized in the towns and country districts. They likewise know that there being no competition in long-distance service it was a matter of indifference with the Bell Company whether they permitted physical connection of such lines with their lines. In many, if not most places, no physical connection was tolerated. This is general knowledge in this State. It is also general knowledge that later the Kinloch Company after a time succeeded in interesting most of the divers local companies, and put in long-distance service in the State in competition with the Bell Company. We use the term Bell Company because it is generally known that the Missouri & Kansas Telephone Company is but one of the numer-

Home Telephone Co. v. Sarcoxie Telephone Co.

ous subsidiary companies under the control of what was originally known as the Bell Company. The Kinloch Company succeeded in interesting the local companies and all over the State there was physical connection with the local companies. This seems to have been accomplished whilst the Bell Company, in a spirit of independence and supreme indifference, thought itself secure. That it was done is as well known to the average Missourian, as is the other history of the State, and what the general public knows, it is at least presumed that the court knows. [Reineman v. Larkin, 222 Mo. l. c. 170.] In that case, Lamm, P. J., said: "Courts take judicial notice of facts of current history, of geographical and scientific facts and of facts commonly known to all mankind. This, because courts should not admit themselves more ignorant than the rest of mankind."

That the contract involved in this case was one of a number made during this period of developing competition to the Bell Company is apparent. Time developed the fact that a farmer or merchant would not leave his farm or his store to talk through the long-distance booth of one company located in the town, when he could connect at his farm or his store with another long-distance telephone company reaching the same place. When this dawned upon the other competing company, independence became activity, and indifference was wrought into a desire to serve all the public by a direct and physical connection. This much is general public knowledge. In the light of the surroundings and the law, statutory and otherwise, we must construe this contract.

The Sarcoxie Company, now physically connected with the Bell Company, says the contract is void, although the consideration has been fully paid and performed by the Home Telephone Company. By the terms of the contract the Home Company was to build a line from Carthage to Sarcoxie. This outlay has

been made and the Sarcoxie Company has enjoyed the benefits of this expenditure. Unless flagrantly violative of law, good conscience would demand the fulfillment of the agreement. With these general observations we pass next to a discussion of the contract from a legal standpoint, pure and simple.

II. That this contract was not intended to stifle competition in long-distance telephone rates, at the time of its making, is apparent from the face thereof, as well as from the history detailed in our paragraph one. That the purpose was to meet competition clearly appears. By paragraph eight of the contract provision is made for meeting competition. In other words the very face of the contract shows what the known public history is, that the object of these contracts connecting the local companies with the Kinloch system was for the very purpose of competition and not for monopoly, and it might be added that the idea of a monopoly first concurred when the farmer or merchant with a local phone connected with the Kinloch system, would, for long-distance messages, use that system rather than go to the local booth of the Bell Company. With such subscribers, the relationship of the local companies not only furnished competition but convenience, and if the rates were the same convenience decided the route of the message. But beyond all this, these connections in the end furnished one continuous, competitive line with that of the Bell Company, and this competition might be broken down, if it shall be said that physical connection with the Bell Company must be made by all companies having connection with the Kinloch system. The contention has never been in this court, and it is a matter of vital importance. The Bell Company is apparently seeking to reap where it hath not sown, and this under the guise of law. The present case was advanced

on statement of counsel that it affected nearly all of the local phone systems of the State.

Whilst it is true the question here has not been before this court, the same question, and practically the same contract, was before the St. Louis Court of Appeals. [Telephone Co. v. Telephone Co., 147 Mo. App. 216.] The appellant in this case was a party to that suit, and the contract under consideration was one with a local company at Neosho, Missouri. In terms the contract is practically the contract here. That court by a vote of two to one held the contract void. REYNOLDS, P. J., filed a dissenting opinion, and there the case rests. In our judgment, the dissenting opinion expresses the law of the case. To our mind the majority opinion overlooks a vital distinction which should be drawn. There is no question that a public telephone company is a public service corporation, and as such must treat the members of the general public alike. Nor can it be questioned that a contract the evident purpose of which it to create a monopoly should be condemned. The vital point in this case is that the petition seeks to enjoin the respondent from permitting a physical connection between its lines and those of the Bell Company. The petition avers that such connection has been permitted and that such is in violation of the contract. It is conceded in the opinion of NORTONI, J., in the case supra, that as an original right, no telephone company, either at common law or under our statute, could compel physical connection between its line and those of the Sarcoxie Company, but it is urged that inasmuch as by the contract in issue the plaintiff has been granted physical connection by switch board with the Sarcoxie Company, then and from that time on all other competing companies must be granted the same privileges. The opinion overlooks the point that if the contract is declared void, the plaintiff has no status with the Sar-

236 Sup.—9

coxie Company and the result would be to leave the Bell Company in full non-competitive control of long-distance business. That such is the desire of the Bell Company can well be gathered. We are using the name of the Sarcoxie Company in lieu of the Neosho Company which was involved in the Court of Appeals. case, because the contracts are the same, and such use is more applicable here.

Now reverting to the vital question in this case,. i. e., if a local telephone company desires to extend its usefulness toward the public, and in order to do so makes a contract of the character of the one here involved, can every other telephone line compel physical connection with such local company? In other words,. has it no control over its property or instrumentalities? Our judgment should not be harsh toward the public, nor on the other hand should it strip a public service corporation of all property rights. The contract under consideration shows that the two companies were occupying different fields of service. It shows that each desired to extend its usefulness. Such could be done by joining the two lines and such other lines as might be connected with either. It would appear that the Home Company had long-distance telephone connections with the Kinloch System. Monopoly is the cry of the Sarcoxie Company in this case. The cry would be feeble if it came from that company alone, but vigor and volume is added to the cry by reason of the physical connection with the Bell Company. It cannot be said that the joining of the two telephone lines operating in different fields creates a monopoly or stifles competition. Such action only broadens the use of both lines. If the two contracting lines occupied the same field and were therefore competitive lines a very different question might be presented.

To our mind the purpose of this contract was to make one continuous system of the lines owned, con-

trolled and · connected with the two contracting corporations. This continuous system to be by physical connection of the several lines through switch boards. The contract contemplates lines operating or being operated in different fields. If this be so, then there is no monopoly either at common law or under the statute. If this be so, then such combined line constituted one competitive line for long-distance business, and in that line of business could not be said to be a monopoly. Other competitive lines could be formed or built. And in this case under the allegations of the petition, which on demurrer are taken to be true, there was a competitive line in the Bell Company. In local business there could be no monopoly, because prior to the contract the corporations operated in different fields as before stated, · and the contract simply increased the usefulness of each so far as the general public was concerned.

So, therefore, upon that part of the contract which provides for the joining of these lines and those connected and controlled by them, we feel constrained to hold the contract valid, unless it be rendered invalid by matters which we discuss next.

III. The Sarcoxie Company goes further, however, and challenges that part of the contract which designates the routing of the messages over the lines of the Home Company and its connections. This they say is violative of all law both statutory and otherwise. Not only so, but that it violates public policy. The contention boiled down is that no agreement can be made whereby two companies or more may undertake to join their lines into one competitive line, and thus route all the business received over such agreed line.

Plaintiff claims that its contract is authorized by statute. The statute reads: ''Any company incorporated as herein provided may contract, own, use and

maintain any line or lines of telephone or magnetic telegraph, whether wholly within or wholly or partly beyond the limits of this State, and shall have power to lease or attach to the line or lines of such company other telephone or telegraph lines, by lease or purchase, and may join with any other corporation or association in constructing, leasing, owning, using or maintaining their line or lines, upon such terms as may be agreed upon between the directors or managers of the respective corporations, and may own and hold any interest in such line or lines, or become lessees thereof, on such terms as the respective corporations may agree.''

That this statute standing alone is broad enough to cover the contract in question there can be no doubt. This was section 1254, Revised Statutes 1899. The contract in question was made in 1905, when this section was in full force and effect, as it is to-day.

Respondent, however, seeks to obviate the force of this section by reason of section 3330, Revised Statutes 1909. Section 3330, Revised Statutes 1909, was section 1255, Revised Statutes 1899, as amended in 1907. The amendment was subsequent to the contract, and therefore we should take the law in force at the date of the contract. Subsequent legislation cannot invalidate contracts lawful at the date of their making.

Section 1255, Revised Statutes 1899, reads: ''It shall be the duty of every telegraph or telephone company, incorporated or unincorporated, operating any telephone or telegraph line in this State, to provide sufficient facilities at all its offices for the dispatch of the business of the public, to receive dispatches from and for other telephone or telegraph lines, and from or for any individual, and on payment or tender of their usual charges for transmitting dispatches, as established by the rules and regulations of such telephone or telegraph line, to transmit the same promptly and with impartiality and good faith, under a penalty

of two hundred dollars for every neglect or refusal so to do, to be recovered, with costs of suit, by civil action, by the person or persons or company sending or desiring to send such dispatch, one-half of the amount recovered to be retained by the plaintiff, and one-half to be paid into the county public school fund of the county in which the suit was instituted; and the burden of proof shall be upon the company to show that the wire was engaged as the reason for the delay in transmitting such dispatch.''

From a reading of this section it will be observed that our statute at the date of this contract did not compel one company to physically connect its line with any other company. The most that was required was that such companies were to provide sufficient facilities at the offices of the corporation ''for the dispatch of the business of the public, to receive dispatches from and for any individual, and on tender or payment of their usual charges for transmitting dispatches, as established by the rules and regulations of such telephone or telegraph line, to transmit the same promptly and with impartiality and good faith.''

This section does not require physical connection between telephone lines. It does require such company to receive all messages from other telephone or telegraph lines and transmit them, as it likewise requires it to receive all messages from individuals. This does not mean that such corporation must yield to a physical connection with its lines by a competitive company and permit the use thereof in that way. In such case and under this statute the telephone corporation or the telegraph corporation has no greater right than the individual. If the individual goes to the office of the telephone company and tenders payment for a message, the company must accommodate him. So, too, if a telegraph company or other telephone company goes in the capacity of an individual or corporate entity and demands a similar service, it

must be rendered. But this does not mean that the telephone company must put up a switchboard for all such individuals or corporations desiring to do business with the telephone company. To illustrate, suppose Jones living upon a farm twenty miles from Sarcoxie, built a private telephone line of his own to Sarcoxie, could he compel the Sarcoxie company to attach his line to their switch board? We think not. Then can a competitive line in the telephone business demand more than would or should be accorded to the individual? We say no. As to business which comes over another line the Sarcoxie Company under this statute would only have to treat it as it would the general public. The general public could go to its booth or office and upon payment of a fee fixed, talk to Carthage or other points where its line reached, but each individual of the general public could not build an individual line of his own and compel physical connection with the switchboard. If the individual could not do so, another corporation could not do so. It must be borne in mind that as to business coming from the Bell Company to the Sarcoxie Company, the Bell Company is in the attitude of an individual, with no less nor more rights. The individual in the town can compel the Sarcoxie Company, upon tender of proper charges, to extend its services by phone to his place of business or residence. The corporation can do the same thing, but not more. The individual cannot build a line of his own and demand physical connection, neither can the corporation. If the Bell Company at Sarcoxie demanded of the local Sarcoxie Company that it place a phone in its place of business such would be within the rights guaranteed by the statute. If it went to the Sarcoxie Company and tendered the proper fee and said it wanted to talk over their line, such would be within the statute, but if it demanded that a physical connection be made between the two lines, so that its customers could talk over

the lines of the Sarcoxie Company, that is an entirely different question. With its customers the Bell Company is doing in a way a private business. This private business it cannot foist upon a competing line save and except as an individual could go to such competing line and demand service. In other words, one telephone company without the consent of the other cannot take charge of and use the instrumentalities of such other company by compelling physical connection therewith. The statute in question never so contemplated.

It occurs to us that this question has been settled by this court in the railroad cases. Railroads which intersect each other must, under the law, provide for the transfer of freight and business from one line to the other, but this does not mean that one company can take physical control of the lines of the other to forward freight originating upon its line. Judge NORTONI attempts to draw a distinction between railroad and telephone companies, but we hardly think there is substance in it.

Under the Railroad Act, we have section 3106, Revised Statutes 1909, which reads: "All railroad corporations may contract with each other, or with other corporations, in any manner not inconsistent with the scope, object and purpose of their creation and management."

This statute in substance is the same as section 3329, Revised Statutes 1909, supra, relating to the rights of telephone companies. The railway act has been construed by this court, and in our judgment such construction is applicable to the telephone statute.

Speaking of the railroad section, GANTT, P. J., in Railroad Co. v. Railroad Co., 135 Mo. l. c. 202, said: "This section in its present shape may well be regarded as conferring the requisite authority to make the 'operating contract' under discussion. In

fact that section is simply declaratory of the principle announced in the decisions already cited and quoted. Indeed, section 2588 would seem to expand the result even of the advanced cases because it legitimates any contract between two railroad companies 'not inconsistent,' etc., so that under this section the given transaction need not be *absolutely* necessary' nor indeed *'necessary.'* It is only obnoxious when it is found to be *inconsistent* with the purposes of the creation and management of the corporations. The previous history of section 2588, both legislative and judicial, would seem to indicate an intention on the part of the State to further and foster transportation of freight and passengers on through lines, and certainly such *inter se* arrangements between railway and other transfer corporations must greatly tend to the public convenience and prevent delays otherwise incident to travel and transshipment. *Under this section the contract between two railway companies may be a lease, or an operating contract, or a temporary permission or parol license, to use and occupy the line of one company to expedite the trains of another,* because of some accident or disaster, or otherwise, provided always that the matter contracted about and the end sought is 'not inconsistent' with the purposes for which the railroad is chartered.''

Under the railway statute this court has held that it is proper for a railway company to enter into a contract with a single ferry company to handle its freight, and that a violation of such contract by employing another ferry company rendered the railroad company liable in damages. It was further held that such contract was not void as violative of public policy, nor as being a contract in restraint of trade or creating a monopoly. [Wiggins Ferry Co. v. Ry. Co., 73 Mo. 389; Wiggins Ferry Co. v. Ry. Co., 128 Mo. 224.]

In these cases the contract provided for one continuous line of transportation. The railway company

Home Telephone Co. v. Sarcoxie Telephone Co.

ended at East St. Louis and wanted to get to St. Louis. The contract was for ferriage across the river, and obligated the railway company not to use any other ferry. At the time there were two other corporations conducting a ferriage business. These cases to my mind practically settle the controversy in this case. Many cases from other jurisdictions are cited and have been examined. Two of them we think sustain the contention of the defendant, but the others are not applicable. On the other hand, there are many cases which conform to the views herein expressed, which appear under point three of plaintiff's brief. As our own cases settle the matter we shall not review the foreign cases. We will, however, reiterate to some extent by saying that if the defendant's theory of the law is correct, then any competitive company can compel physical connection of its lines with the lines of the Sarcoxie Company. Not only so, but any individual in the country could build a line of his own and compel connection with a city telephone system. To be plain in language, such a contention, if sustained, would absolutely deprive a corporation of all property rights in its own business. Such contention, if sustained, would give the Kinloch Company the right to force physical connection for its own business with the Bell Company at common points and thereby it could reach territory never touched, nor expected to be touched, by the Kinloch Company, and *vice versa*. If the Kinloch Company should by suit seek to compel the Bell Company to allow it physical connection with its lines reaching part of the country not occupied by the Kinloch Company, the argument in this court would be quite contrary to the one now advanced, yet the exact question would be involved. To hold that the Kinloch Company could have built its lines from the East to the city of St. Louis and then under our laws could have compelled a physical connection with the Bell Company lines, and used the same for forwarding

their own business, to my mind is preposterous. It would be a virtual confiscation of property rights. Corporations are separate entities, and as such are only entitled under our statutes to the same rights as an individual. This right is to be treated as the general public is treated and not otherwise. Each and every individual cannot build independent phone lines and compel a phone company to connect them with the switchboard. Competing companies have no greater rights.

But, in addition to all this, the contention of defendant, if sustained, would not encourage competition, but rather retard it.

The theory of the case at bar is that under the law the Sarcoxie Company was compelled to grant physical connection to the Bell Company, because it had arranged for such connection with a competitor of the Bell Company. Under the railway cases cited supra, this contention is not well founded. One other question remains and that we discuss next.

IV. It is next contended that this contract violates our statutes with reference to pools and trusts. We shall not set out the statutes, because they are well known. What we have heretofore said practically disposes of this contention, and disposes of it adversely to the claims of the defendant. The contract covers corporations operating in different fields, so far as local business is concerned, and as to long-distance business it contemplates a continuous competitive line. We are of opinion that the contract is violative of no law and is good.

In Wiggins Ferry Co. v. Ry. Co., 73 Mo. l. c. 411, we said: "While holding the contract, as we have construed it, to be valid, yet if it is shown by extrinsic evidence to be in conflict with public policy, to that extent it must yield and give way, and it is for the defendant affirming it to be so, to show it. The

salutary rule that a contract against public policy or interest will not be enforced, was adopted to conserve the best interests of society and the State, and the party who invokes it as a shield behind which to hide and protect himself against the damages attachable to a breach of a contract, especially when such party is in the full and free enjoyment of all the fruits of the contract, must make it clearly manifest to the mind of the court that the obligations imposed by it are condemned by the rule. In the case of Bryant v. Fairfield, 51 Me. 146, it was held that it is not for a party who retains the consideration of the contract, to invoke the rule that the contract is against the policy of the law. While not wiling to go to the extent of that case and say that a party in the enjoyment of all he was to get in consideration of a promise made by him to another, should not be allowed, when sued for a breach of such promise, to plead that it was against public policy, we may safely say, without infringing upon any rule of common honesty, justice or right, that to make such plea effectual, he should restore, or be required to restore, all that he received as a consideration for the promise which he thus seeks to avoid.''

As before stated the defendant has enjoyed the benefits of the contract and evidently through its new friend is now pleading public policy. Such pleading comes with little grace in a court of equity.

The matter of remedy is not seriously questioned, and if it were we could not say that equity should not interfere under the statements in the bill. The cause should be reversed and remanded to be proceeded with under the views herein expressed. It is so ordered. All concur.